# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of:<br>Information associated with the usernames identified as MattTheHat#8031 and TheHat#8031, ("the SUBJECT ACCOUNTS") that are stored at premises controlled by Discord, Inc. (the "PROVIDER"), a provider of electronic communication and remote computing services, headquartered at 444 De Haro Street, Suite 200, San Francisco, CA 95014 | Case No.  21-mj-03872 |

**APPLICATION FOR WARRANT BY TELEPHONE PURSUANT TO 18 U.S.C. § 2703**

I, Timothy Alon, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:   -   *See Attachment B*

The basis for the search is:

       ☑ Evidence of a crime;
       ☑ Contraband, fruits of crime, or other items illegally possessed;
       ☐ Property designed for use, intended for use, or used in committing a crime.
The search is related to a violation of:

| *Code section(s)* | *Offense Description* |
|---|---|
| 18 U.S.C §§ 2251, 2242(b), 2252A(a)(2), 2252A(a)(5). | Production of child pornography, coercion and enticement, receipt and distribution of child pornography, possession of and access with intent to view child pornography. |

The application is based on these facts: *See attached Affidavit, which is incorporated herein by reference.*

_____
*Applicant's signature*
Timothy Alon, Special Agent – FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and State: _____

_____
*Judge's signature*
Pedro V. Castillo, U.S. Magistrate Judge
*Printed name and title*

AUSA: Bruce K. Riordan (213-894-0480)

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

This warrant applies to information associated with the usernames identified as MattTheHat#8031 and TheHat#8031 (the "SUBJECT ACCOUNTS"), that is within the possession, custody, or control of Discord Inc. (Discord) (the "PROVIDER"), a company that accepts service of legal process at 444 De Haro Street, Suite 200, San Francisco, California 95014, regardless of where such information is stored, held, or maintained.

## ATTACHMENT B

## ITEMS TO BE SEIZED

**I.    SEARCH PROCEDURES**

1.     The warrant will be presented to personnel of Discord Inc. (Discord) (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.     To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.     The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.     With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other

sophisticated techniques, including to search for known images of child pornography.  The review of the electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   If the search team encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

6.   The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant.  The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.   Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed—and preserved by the search team for authenticity and

chain of custody purposes—until further order of the Court. Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.   The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.   Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.   INFORMATION TO BE DISCLOSED BY THE PROVIDER

10.   To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNTS listed in Attachment A:

a.   All contents of all wire and electronic communications associated with the SUBJECT ACCOUNTS, limited to that which occurred on or after August 1, 2020, to July 30, 2021,[8] including:

---

[8] The date of the execution of the premises search described in the Affidavit.

    i. All emails, communications, or messages of any kind associated with the SUBJECT ACCOUNTS, including stored or preserved copies of messages sent to and from the account, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each e-mail or message, and any related documents or attachments.

    ii. All records or other information stored by subscriber(s) of the SUBJECT ACCOUNTS, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files.

    iii. All folders and files associated with the SUBJECT ACCOUNTS, including stored or preserved copies of files sent to and from the account, the source and destination addresses associated with file, the date and time at which each file was sent, and any user-created organizational structure within the SUBJECT ACCOUNTS.

    iv. All transactional information of all activity of the SUBJECT ACCOUNTS described above, including log files, messaging logs, records of session times and durations, dates and times of connecting, and methods of connecting, and email "invites" sent or received via the PROVIDER, and any contact lists.

    v. All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT

ACCOUNTS, including contacts with support services and records of actions taken.

        b.    All other records and information, including:

        i.    All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or e-mail addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, and including any changes made to any subscriber information or services, including specifically changes made to secondary email accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the SUBJECT ACCOUNTS.

        ii.    All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNTS described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations, and including specifically the specific product name or service to which the connection was made.

### III. __INFORMATION TO BE SEIZED BY THE GOVERNMENT__

11.  For each SUBJECT ACCOUNTS listed in Attachment A, the search team may seize:

a.    All information described above in Section II.10.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 2251 (production of child pornography); 18 U.S.C. § 2242(b) (coercion and enticement) 18 U.S.C. §§ 2252A(a)(2)(receipt and distribution of child pornography and 2252A(a)(5)(B)(possession of child pornography), namely:

i.    Information relating to who created, accessed, or used the SUBJECT ACCOUNTS, including records about their identities and whereabouts.

ii.   Child pornography, as defined in 18 U.S.C. § 2256(8).

iii.  Any files or records that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including but not limited to documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

iv.   Any files or records tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography, as defined in 18 U.S.C. § 2256.

v.    Any files or records that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

vi.   Any and all files or records which are sexually arousing to individuals who are interested in minors. Such material is commonly known as "child erotica" and includes images of children, written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

vii.  Any files or records that pertain to accounts with any Internet Service Provider.

viii. Any passwords, encryption keys, and other access devices that may be necessary to access folders and files in the SUBJECT ACCOUNTS;

b.    All records and information described above in Section II.10.b.

IV.        **PROVIDER PROCEDURES**

12.  Notwithstanding 18 U.S.C. § 2252/2252A or any similar statute or code, the provider shall disclose responsive data by sending it to the following address via US Mail, or to the following email address:

```
Special Agent Timothy Alon
4811 Airport Plaza Drive, Suite 500
Long Beach, California 90815
VIA EXPRESS DELIVERY SERVICE
```

```
Phone: (310) 877-6410
E-mail: talon@fbi.gov
```

13.  IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

## AFFIDAVIT

I, Timothy Alon, being duly sworn, declare and state as follows:

### I.  INTRODUCTION

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 1995.  My responsibilities with the FBI include investigations into the sexual exploitation of children and child pornography in the Central District of California.  The FBI is responsible for enforcing federal criminal statutes involving the sexual exploitation of children under 18 U.S.C. § 2251 et seq.  During my tenure with the FBI, I have conducted and participated in numerous investigations of criminal activity, including at least 300 investigations in which targets have exploited children, typically by transmitting child pornography using computers connected to the Internet.  During my investigations in these cases, I have participated in the execution of at least 300 search warrants in which evidence of these violations was seized.  I am currently assigned to the Child Exploitation Investigations Group ("CEIG"), which is a task force specifically dedicated to investigating and combating child exploitation.  The CEIG task force is operated by the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations.

2.    Through my training and my experience, I have become familiar with the methods of operation used by people who commit offenses involving the sexual exploitation of children.  I have

attended training classes concerning computer crimes and the
sexual exploitation of children on the Internet.  This training
has given me an understanding of how people involved with
offenses relating to the sexual exploitation of children use the
Internet to further those offenses.  My experience in
investigations in this regard has supplemented my understanding
of how people involved in offenses related to the sexual
exploitation of children use the Internet to further those
offenses.

## II. <u>PURPOSE OF AFFIDAVIT</u>

I make this affidavit in support of an application for a
warrant for information associated with the usernames identified
as **MattTheHat#8031** and **TheHat#8031** (the "SUBJECT ACCOUNTS"),
that are stored at premises controlled by Discord Inc. (the
"PROVIDER"), a provider of electronic communication and remote
computing services, headquartered at 444 De Haro Street, Suite
200, San Francisco, CA 95014.[1]  The information to be searched is
described in Attachment A.  This affidavit is made in support of

---

[1] Because this Court has jurisdiction over the offense(s)
being investigated, it may issue the warrant to compel the
PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A).
<u>See</u> 18 U.S.C. §§ 2703(a) ("A governmental entity may require the
disclosure by a provider . . . pursuant to a warrant issued
using the procedures described in the Federal Rules of Criminal
Procedure . . . by a court of competent jurisdiction") and 2711
("the term 'court of competent jurisdiction' includes -- (A) any
district court of the United States (including a magistrate
judge of such a court) or any United States court of appeals
that -- (i) has jurisdiction over the offense being
investigated; (ii) is in or for a district in which the provider
of a wire or electronic communication service is located or in
which the wire or electronic communications, records, or other
information are stored; or (iii) is acting on a request for
foreign assistance pursuant to section 3512 of this title").

an application for a warrant under 18 U.S.C. §§ 2703(a),
2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require the PROVIDER
to disclose to the government copies of the information
(including the content of communications) described in Section
II of Attachment B.  Upon receipt of the information described
in Section II of Attachment B, law enforcement agents and/or
individuals assisting law enforcement and acting at their
direction will review that information to locate the items
described in Section III of Attachment B.  Attachments A and B
are incorporated herein by reference.

    3.    As described further in Attachment B, the requested
warrant seeks authorization to seize evidence, fruits, and
instrumentalities, as specified in Attachment B, of violations
of 18 U.S.C. § 2251 (production of child pornography); 18 U.S.C.
§ 2242(b) (coercion and enticement); 18 U.S.C. § 2252A(a)(2)
(receipt and distribution of child pornography); and 18 U.S.C.
§ 2252A(a)(5) (possession of and access with intent to view
child pornography); (collectively, the "Subject Offenses").

---

[2] The government is seeking non-content records pursuant to
18 U.S.C. § 2703(d).  To obtain the basic subscriber
information, which does not contain content, the government
needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To
obtain additional records and other information--but not
content--pertaining to subscribers of an electronic
communications service or remote computing service, the
government must comply with the dictates of section
2703(c)(1)(B), which requires the government to supply specific
and articulable facts showing that there are reasonable grounds
to believe that the records or other information sought are
relevant and material to an ongoing criminal investigation in
order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The
requested warrant calls for both records containing content (see
Attachment B paragraph II.10.a.) as well as subscriber records
and other records and information that do not contain content
(see Attachment B paragraph II.10.b.).

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrant and does
not purport to set forth all my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

5.    In March of 2021, a father ("Parent 1") of a 15-year-
old daughter ("Victim 1") notified the Shelby County Sheriff's
Office ("SCSO") in Tennessee that Victim 1 had been engaging in
sexually explicit online private message chats with a user named
"Shark" on the social media platform Discord.  Parent 1 provided
the FBI with Victim 1's computer, Victim 1's Discord account
information and password, and consent to access and review
Victim 1's Discord account.  From Victim 1's Discord account,
the FBI reviewed chat conversations that occurred between Victim
1 and a Discord user who was later identified as Matthew
Christian LOCHER ("LOCHER") where LOCHER encouraged Victim 1 to
send him naked pictures of herself and engage in masochistic
behavior.

6.    In September of 2020, a mother ("Parent 2") of a 17-
year-old daughter ("Victim 2") notified the National Center for
Missing and Exploited Children ("NCMEC") that she found Victim 2
had been communicating with someone using a Skype name of

"daddyshark5," later determined to be "daddyshark_5."  Victim 2
sent "daddyshark_5" sexual images and videos.  The Skype user
"daddyshark_5," was later identified as LOCHER.

7.    In July 2020, a parent ("Parent 3") of a 12-year-old
female ("Victim 3") advised the Springfield Police Department
("SPD") in Ohio, that Victim 3 was communicating with a Discord
user named "HeyThere."  The conversation included "HeyThere"
encouraging Victim 3 to murder her parents and run away to be
with "HeyThere" in California.  "HeyThere" told Victim 3, "I'd
use your body whenever I want in whatever way I want."  Victim 3
also sent "HeyThere" a picture of herself.  Parent 3 confirmed
with SPD that Victim 3 started a fire at their residence soon
after her conversation with "HeyThere" on Discord.  The Discord
user "HeyThere" was later identified as LOCHER.

8.    On July 30, 2021, a federal search warrant was
executed at LOCHER's residence located at 2014 Carnegie Lane,
Apartment 2, Redondo Beach, CA ("LOCHER RESIDENCE").  I learned
from an interview of LOCHER and preliminary review of his cell
phone seized from his person pursuant to the search warrant that
he had been recently communicating with Victim 2 utilizing a
Discord username of "TheHat."  After conducting publicly
accessible online queries, law enforcement learned that the full
username for "TheHat" was "TheHat#8031" and the username was
associated with "MattTheHat#8031," the SUBJECT ACCOUNTS.

9.    In previous conversations with Victims 1, 2, and 3,
LOCHER enticed, encouraged, and instructed the victims to
produce child pornography and child sexual abuse material

("CSAM") in the form of sexually explicit images and video recordings of themselves to send to LOCHER over the internet, including through the use of Discord.  Given his history of using Discord and other applications to conduct sexually explicit communication with minors, LOCHER's current use of Discord to communicate with Victim 2 indicates to me that there is probable cause to believe that he is using the SUBJECT ACCOUNTS to unlawfully communicate with additional minors.

### IV. DEFINITION OF TERMS

10.  The following terms have the indicated meaning in this affidavit:

a.    The terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256.

b.    The term "computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

c.    The term "email" (electronic mail) is defined as the messages sent from one person to another via a computer. Email may also include files sent as attachments to or embedded within text messages.  Email can also be sent automatically to a large number of addresses via a mailing list.

d.    The term "Internet" is defined as the worldwide network of computers—a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide.  The Internet is not an online service and has no real central hub.  It is a collection of computer networks, online services, and single user components.  In order

to access the Internet, an individual computer or digital device user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

e.   The term "Internet Protocol" ("IP") is defined as the primary protocol upon which the Internet is based.   IP allows a packet of information to travel through multiple networks (groups of linked computers) on the way to its ultimate destination.

f.   An Internet Protocol address ("IP Address") is a unique numeric address used to connect to the Internet.   An IPv4 IP Address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).   In simple terms, one computer in a home may connect directly to the Internet with an IP Address assigned by an ISP.   What is now more typical is that one home may connect to the Internet using multiple digital devices simultaneously, including laptops, tablets, smart phones, smart televisions, and gaming systems, by way of example.   Because the home subscriber typically only has one Internet connection and is only assigned one IP Address at a time by their ISP, multiple devices in a home are connected to the Internet via a router or hub.   Internet activity from every device attached to the router or hub is utilizing the same external IP Address assigned by the ISP.   The router or hub "routes" Internet traffic so that it reaches the proper device. Most ISPs control a range of IP Addresses.   The IP Address for a user may be relatively static, meaning it is assigned to the

7

same subscriber for long periods of time, or dynamic, meaning
that the IP Address is only assigned for the duration of that
online session.  Most Internet Service Providers (defined below)
maintain records of which subscriber was assigned which IP
Address during an online session.

      g.   The term "Internet Service Provider" ("ISP") is
defined as a business that allows a user to dial into or link
through its computers thereby allowing the user to connect to
the Internet for a fee.  ISPs generally provide only an Internet
connection, an electronic mail address, and maybe Internet
browsing software.  A user can also connect to the Internet
through a commercial online service such as AT&T, Verizon, or
Time Warner Cable.  With this kind of connection, the user gets
Internet access and the proprietary features offered by the
online service, such as chat rooms and searchable databases.
ISPs maintain records pertaining to the individuals or
businesses that have subscriber accounts with them.  Those
records often include identifying and billing information,
account access information in the form of log files, e-mail
transaction information, posting information, account
application information, and other information both in computer
data and written record format.

      h.   The terms "jpeg," "jpg," "gif," "bmp," and "art"
are defined as graphic image files, namely, pictures.

      i.   The terms "mpeg," "mpg," "mov," "avi," "rm," and
"wmv" are defined as video or movie files.  To use these video
files, one needs a personal computer or other digital device

with sufficient processor speed, internal memory, and hard disk space to handle and play typically large video files. One also needs a video file viewer or client software that plays video files. One can download shareware or commercial video players from numerous sites on the Internet.

      j. A "chat" refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

      k. "Chat room" refers to the ability of individuals to meet in one location on the Internet in order to communicate electronically in real-time to other individuals. Individuals may also have the ability to transmit links to electronic files to other individuals within the chat room.

## V. <u>BACKGROUND ON USE OF COMPUTERS, CHILD PORNOGRAPHY, AND DISCORD, SKYPE, TWITCH</u>

### A. Background on Use of Computers and Child Pornography

    11. Based upon my training and experience in the investigation of child pornography and with social media platforms, and information related to me by other law enforcement officers involved in the investigation of child pornography offenses generally, I know the following information about the use of computers and child pornography:

9

a.    Computers and computer technology have
revolutionized the way in which child pornography is produced,
distributed, and utilized.  Child pornographers can now produce
both still and moving images directly from a common video camera
and can scan these images into computer-readable formats.  The
use of digital technology has enabled child pornographers to
electronically receive, distribute, and possess large numbers of
child exploitation images and videos with other Internet users
worldwide.

b.    The computer's ability to store images in digital
form makes the computer itself an ideal repository for child
pornography.  The size of the electronic storage media (commonly
referred to as the hard drive) used in home computers has grown
tremendously within the last several years.  These drives can
store hundreds of thousands of images at very high resolution.
Computer users can choose their method of storing files: either
on a computer's hard drive, an external hard drive, a memory
card, a USB thumb drive, a smart phone or other digital media
device, etc. (i.e., "locally") or on virtual servers accessible
from any digital device with an Internet connection (i.e.,
"cloud storage").  Computer users frequently transfer files from
one location to another, or from one digital or storage device
to another, such as from a phone to a computer or from cloud
storage to an external hard drive.  Computer and digital device
users also often create "backup," or duplicate, copies of their
files.  In this way, digital child pornography is extremely
mobile and such digital files are easily reproduced,

10

transported, and stored.  For example, with the click of a button, someone trading images and videos containing child pornography with others through an online instant messaging application can be copied and put onto other digital devices or media storage devices such as external hard drives small enough to fit onto a keychain.  Just as easily, these files can be copied onto compact disks and/or stored on mobile digital devices, such as smart phones and tablets.  These devices are easily stored in vehicles, on someone's person in a purse or pocket, or in storage containers.  Furthermore, even if the actual child pornography files are stored on a "cloud," files stored in this manner can only be accessed via a digital device.  Therefore, viewing this child pornography would require a computer, smartphone, tablet, or some other digital device that allows the user to access and view files on the Internet.

B.    **Background on Discord**

12.  Discord Inc. owns and operates a free-access all-in-one voice and text chat application and website of the same name that can be accessed at http://www.discordapp.com (hereinafter, "Discord").  Discord's application (and website) is an online communication platform that allows users to create private virtual communication servers that can be shared with others. On those servers, users can create dedicated audio, video, and text communication channels, and users are able to join or connect to those channels to communicate.  Discord channels are similar to a chat room, in that users are able to share real-time audio, video, and text messages with other participants in

11

the channel.  Discord users are also able to live stream and to send one-to-one direct messages with other users.

13.   To use Discord, a user creates an account and uses the account to communicate with other Discord users.  Each Discord user account has numerous identifiers:

a.   First, when user first registers an account, Discord asks users to enter an email address, to create a username and password, and enter a date of birth.  The information entered during the registration process is not verified by Discord.  Additional information such as full name, telephone numbers, screen names, credit card and billing address, and other personal identifiers may be added.  Users can also link their social media accounts to their Discord accounts. A user must verify their email in order to be able to use some of the features of Discord such as sending messages in servers and channels.

b.   Next, Discord assigns each account a permanent identification number, referred to as a "user ID number," which Discord uses to internally identify and track an account, including in its audit logs.  The user ID number is visible to a user when the user is viewing the user's account in "Developer Mode" on a computer, but is mostly relevant only to Discord's internal recordkeeping.  The user ID number does not change when the user changes the username.

c.   Then, a Discord user creates a unique username of its choosing for the account.

12

d.    Finally, Discord then creates a "tagID," which is the user's unique username followed by a hash and an auto-generated 4-digit code, in the format of characters#numbers (for example, "kingofdarkness#5547").  When using Discord on a computer, the user's Discord tagID is visible in the bottom left corner of the Discord screen.  A user can change its username at any time.  A change in username does not affect the tagID.

e.    Additional information is required when purchasing an in app service called "Discord Nitro."  Discord Nitro is a premium service within Discord that allows upgraded services including changing tagIDs, customizable avatars, and larger uploads of content.

14.    Once registered, a user can access different features on Discord.  Some, but not all, of those features follow:

a.    Discord users can exchange private messages between users (i.e., messages that do not appear in a public text channel, but which are revealed only to the users participating in the private communication), participate in public text chatroom discussions, and voice chat.

b.    Discord also supports live streaming of video from a user's device.

15.    Discord retains IP logs for a given user ID or IP address.  These logs can contain information about the actions taken by the user ID or IP address on Discord, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Discord profile, that

user's IP log would reflect the fact the user viewed the profile, and would show when and from what IP address the user did so.

16.   From my training, experience, and knowledge of this and similar cases, I know that users of Discord and similar applications access Discord using their mobile devices, as well as with computers.  Accordingly, I know that a user can access their Discord account by connecting to the Internet using IP addresses outside of their residence, such as if they access Discord on their smartphone while connected to a WiFi network at work or school.  For that session, the records would list the IP address of that WiFi network used by the user to connect to the Internet to access Discord.

17.   Social network providers like Discord typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Discord users might communicate directly with Discord about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Discord typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In addition to Discord's computers or servers, the Discord

14

application loads this information onto its users' digital devices and a digital device with Discord on it is likely to retain some of the above-described information.

### C.   Background of Skype

18.   Skype is a proprietary telecommunications application owned by Microsoft Corporation, that specializes in providing Voice over Internet Protocol ("VoIP") videotelephony, videoconferencing and voice calls.  Skype also has instant messaging, file transfer, debit-based calls to landline and mobile telephones, and other features.  Once downloaded to a digital device, the Skype application will save some information (for example, logs of messages or dates and times of use) on the application itself which is over recoverable.

### D.   Background of Twitch

19.   Twitch is a live streaming service operated by Twitch Interactive.  The website focuses on video game live streaming including eSports competition, music and other programing broadcasts.  Content on Twitch can be accessed on the Twitch website from an individuals' computer or from a Twitch app on a smart phone.   Creating an account on Twitch allows users to interact with broadcasters and the community via chat, follow their favorite broadcasters to receive alerts when they go live and broadcast to the Twitch community from their own channels.

VI. <u>STATEMENT OF PROBABLE CAUSE</u>

A.    **LOCHER Uses Discord to Encourage Victim 1 to Engage in Masochistic Behavior and Send Nude Photographs of Herself**

    1.    <u>Victim 1's Parents Tell the FBI that "Shark#5645" Asked Victim 1 to Cut Herself and Send Nude Photos of Herself to Him</u>

20.   On or about July 6, 2021, I reviewed FBI Memphis reports and documents pertaining to their investigation of a 15-old-year female victim communicating with a Discord user "Shark#5645" ("Shark") who was later identified as LOCHER.  I learned the following:

    a.    On or about March 17, 2021, FBI Memphis received information from Parent 1 stating that Victim 1 was exchanging private messages on Discord with a user named "Shark."  Parent 1 observed cuts on his daughter's body.  When Parent 1 asked Victim 1 why she was cut, Victim 1 told him that her online boyfriend told her to cut herself.  Victim 1 also stated that she sent her online boyfriend multiple nude photos of herself upon his request via Discord.  Victim 1's parents located her Discord account and observed messages between Victim 1 and Shark#5645, whom they believed to be an adult male.  Parents also identified nude images of Victim 1 that were sent to Shark#5645.

    b.    On or about March 17, 2021, Parent 1 provided to FBI Memphis a Lenovo Thinkpad (the "laptop") that his daughter used to communicate with Shark#5645 on Discord and written consent to search the laptop.  FBI Memphis conducted a forensic analysis on the laptop and located images taken by Victim 1 on

the laptop that were also observed in the Discord conversations. The images found on the laptop were not sexually explicit. FBI Memphis also found private messages and images sent between Victim 1 and Shark#5645 on Discord. The messages and images showed that Victim 1 had cut herself and had also sent nude images of herself at the request of Shark#5645. FBI Memphis also saw in the Discord chats an image of a male penis in an aroused state sent to Victim 1.

2. Review of Chat Conversations Between Victim 1 and "Shark#5645" Shows Encouragement of Victim 1 to Engage in Masochistic Behavior and Provide Nude Photographs

21. On or about July 6, 2021, I learned that on or about April 19, 2021, FBI Memphis completed an analysis of the Discord chats between Victim 1 and Shark#5645. That analysis showed Shark#5645, displaying as its username "Shark," engaged in conversation with Victim 1 and persuading, inducing, coercing, and enticing Victim 1 to engage in masochistic abuse, as described below in the following summary of messages between Shark and Victim 1:

a. On or about January 20, 2021, the following conversation regarding a master-slave relationship occurred:

**Shark:** Good. What are you?

**Victim 1:** I am your slave

**Shark:** My what?

**Victim 1:** Slave

**Shark:** Just a slave

**Victim 1:** …did you want me to add nigger to it?

17

**Shark:**   I did

**Victim 1:** Of course… im your nigger slave

**Shark:**   I know you hate that.  It's about putting you below

me.  But once you are fully in your place I'll give

you lots of love and affection, more than you've ever

been given before

      a.   On or about January 20, 2021, the following

conversation regarding masochistic abuse and production of child

pornography occurred:

**Victim 1:** You know tiffany[3] really loves this

**Shark:**   Oh?  She loves me making you call yourself a little

nigger slave? Putting you down? Take dirty pictures

for me and hurt yourself?

**Victim 1:** …I didn't mean it exactly like that but,,,,, ig[4]

      b.   On or about January 20, 2021, the following

conversation regarding LOCHER's sexual interests in minors

occurred:

**Victim 1:** Ew… You got some weird fetishes

**Shark:**   Tons

**Victim 1:** Well go ahead and tell me all of them, so I can judge

you

**Shark:**   Eh, I don't want to scare [Victim 1's true name] off.

**Victim 1:** That sure as hell turns me on, scare me then, I wanna

---

[3] At various points in the conversation, Victim 1 referred
to herself as "Tiffany" and "Crystal;" "Tiffany" and "Crystal"
are not real persons but rather names that Victim 1 used other
than her own to refer to different aspects of her personality.

[4] Based on my training and experience, I know "Ig" to
commonly refer to an abbreviation for "I guess,"

know

**Shark:** There's lots, but snuff, puke, a bit of watersports, cutting, beating, race play, hanging, pedo, kidnapping, etc. etc[5]

**Victim 1:** …Well then! "I've never met a pedo like you before! Not sure [Victim 1's real name] has either

**Shark:** Haha good

**Shark:** Oh also humiliation and degradation. Like I'm going to make her lick the toilet seat.

**Victim 1:** Not sure if Crystal is going to allow her to do that

**Shark:** I hope none of you get in the way. She chose this.

c. On or about January 21, 2021, the following conversation regarding "Shark's" sexual interests in minors occurred:

**Victim 1:** … I forgot im still a high schooler and have work to do lmao… anyways yeah, I have some school work to do that im not gonna do until later on.

---

[5] Based on my training and experience, I know when people are chatting online and use the following terms they are referring to the following sexual conduct: "snuff" refers to sex where one participant dies at the end; "puke" refers to a sex act where participants vomit on each other; "watersports" refers to a sex act where participants urinate on each other; "cutting" refers to sex and non-sex acts where participants cut themselves or others with sharp objects to the point of bleeding; "beating" refers to bondage-domination-sadism-masochism ("BDSM") (and more violent) sex acts where participants inflict physical violence (whether via body or objects) to each other; "race play" refers to sex between individuals of different races where one participant inflicts degrading racism on the other; "hanging" refers to the sex act of autoerotic asphyxiation or, in extreme cases, actual hanging to death; "pedo" refers to pedophilic; and, finally, "kidnapping" refers to the incorporation of actual or simulated kidnapping during a sex act.

**Shark:**    Good girl *PETS*[6]… And yeah try to do your school work
              now so we talk a bunch today.

              d.   On or about January 21, 2021, the following
conversation regarding LOCHER's intent to meet Victim 1 and have
her send him child pornography occurred:

**Shark:**    Now you're all angry.  I'm guessing it's because
              you're horny and frustrated

**Victim 1:** Oh shut up.  No one asked you

**Shark:**    Don't worry, when you get here I'll fuck you until you
              can't move

**Victim 1:** Whatever

**Shark:**    It's true

**Victim 1:** You're not making my situation any better

**Shark:**    Good. And don't worry, I'm turned on too.

**Victim 1:** Wait how come we have to send nudes but we can't get
              any dick pictures?

**Shark:**    Ha Next time [Victim 1's real name] sends some I'll
              reward her
              with one

---

[6] Based on my training and experience, in BDSM sex acts, I
know that a dominant sex partner will sometimes "pet" (whether
physically or virtually in a chat) the submissive sex partner to
simulate the approval a person gives to his or her domesticated
animal (or "pet") by "petting" (i.e., stroking with a hand) the
animal's head or body; that is, the dominant sex partner will
express approval in a degrading manner by insinuating that the
submissive sex partner is the property of the dominant sex
partner and under that partner's control (much like a
domesticated animal is the property and under control of the
person who owns the animal).

e.   On or about January 23, 2021, Victim 1 made the following statement to "Shark" regarding sending images of herself:

> Victim 1:      …Anyways im gonna go and take a shower - after I cut - so I can hide the evidence…"

[Victim 1 then sent an image of a thigh with cuts to LOCHER.]

i.   **Victim 1:** Anyways im gonna take pictures after I get out of the shower"

ii.   [Victim 1 sent nude images of herself to LOCHER.  These images include what appears to be a selfie of the victim's face and nude body outside of the shower, and a close up image of cuts on Victim 1.]

3.   <u>In Interview, Victim 1 Identifies "Shark" as a White Male in His Thirties Named "Matt" with Brown Hair and a Brown Beard</u>

22.  On or about July 6, 2021, I learned that on or about April 21, 2021, Victim 1 was interviewed by FBI Child Adolescent Forensic Interviewer ("CAFI") Hillary Kozloski-Smith at the FBI office in Memphis.  Victim 1 provided the following information:

a.   Victim 1 met an individual she knew as "Matt," via the website Omegle (which is a video chat platform) around October 2020.  Victim 1 wanted to run away from home and began her conversation with "Matt" by disclosing her "ASL," which she described meant her age, sex, and location.  Victim 1 told "Matt" that she was 15 years old and they decided to move their conversation from Omegle to Discord.  Victim 1 described the

Discord account used by "Matt" as having the display name of
"Shark" with a profile image of a shark wearing a suit.

      b.   Victim 1 confided to "Matt" that she suffered
from depression and had feelings regarding committing suicide.
She felt relieved discussing her mental health struggles with
him.  He, in return, provided advice regarding how she could
commit suicide.  According to Victim 1, "Matt" showed her a
method to hang herself with a belt and watched her online during
a failed attempt to hang herself to death according to his
instructions.  "Matt" also confided to Victim 1 that he was into
"self-harm;" given the context of the conversations, it appears
Matt's interest in "self-harm" was Matt causing others inflict
self-harm on themselves.  Matt also gave her rules to follow.
For example, he wanted her to think less of herself due to his
"dominant trait."  As such, Victim 1 was told she had to be
skinny enough to see her bones and to call herself a "little
nigger slave pet."

      c.   Victim 1 said she became uncomfortable with their
relationship when "Matt" asked her to send nude images of
herself.  Victim 1 took nude images of herself, however, on her
mom's phone and via the Discord app.  Victim 1 used Discord only
to send nude images and converse with "Matt", who would
compliment her when she did what he asked.  Victim 1 also
recalled a time when she sent him "self-harm" images of her cuts
and received an image from "Matt" of a male holding a penis in
his hand.  Afterwards, "Matt" responded that this was what

Victim 1 would do to him.  Victim 1 believed that the penis in the image was "Matt's."

       d.   Victim 1 stated that once he showed her an image what appeared to be a teenage female with self-harm scars on her arms.  He stated that it was proof that a girl killed herself because "Matt" left her for Victim 1.  "Matt" also admitted that he was into young kids and told Victim 1 that if they had children together, he would do the same things to them as he was doing to her.  This included having sex with their children.

       e.   Victim 1 described "Matt," based on her viewing videos and pictures of "Matt" over the course of their online relationship, as a white male in his 30's with brown hair and a brown beard.  She said he was an owner of a technology company.

       f.   On July 27, 2021, I reviewed the DMV record for LOCHER.  The record shows that LOCHER is 30 years of age and has brown hair.  In his driver's license photograph, LOCHER has a brown beard.

       4.   <u>Identification of "Shark" as LOCHER Using an IP Address Associated with LOCHER's Residence</u>

23.  On or about July 6, 2021, I reviewed a document provided by Discord on or about June 9, 2021, regarding Discord user name "Shark" and user identification "685830350735147059."  Discord provided the user's login information between on or about December 11, 2020, and April 20, 2021.  I reviewed the login IP addresses and noted a majority of the IP addresses logged during the times Victim 1 communicated with Shark was 47.144.164.31 ("IP ADDRESS 1").  Specifically, out of the 1,993

instances that the user associated with "Shark" logged into Discord between December 11, 2020, and April 20, 2021, the user utilized IP ADDRESS 1 approximately 1,936 times. Put another way, 97% of all logins for the "Shark" account during this time period were made using IP ADDRESS 1.

24. According to a publicly accessible website that provides information on the entity that owns IP addresses, Maxmind.com, IP ADDRESS 1 belongs to Frontier Communications.

25. On or about July 6, 2021, I reviewed a document prepared by Frontier Communications dated on or about June 10, 2021, regarding the subscriber of the IP ADDRESS 1. According to Frontier Communications, LOCHER was the subscriber of IP ADDRESS 1. The service address was listed as 2014 Carnegie Lane, Apartment 2, Redondo Beach, CA ("LOCHER RESIDENCE"). The records show that IP ADDRESS 1 was assigned to LOCHER starting on or about December 11, 2020, through the date of the report, June 10, 2021.

26. The June 9, 2021 Discord report also listed additional IP addresses that were used to log into the "Shark" account. According to Maxmind.com, all of these additional IP addresses are owned by Verizon Wireless. The Discord report indicated that the following IP addresses were used to log into the "Shark" account on the following dates:

        a.   174.193.195.200 logged in on January 24, 2021;

        b.   174.193.156.225 logged in on January 30, 2021; and

c.   174.193.163.242 logged in on March 19, 2021 (collectively, "VERIZON IP ADDRESSES").[7]

27.  On or about July 6, 2021, I reviewed a document prepared by Verizon Wireless dated on or about June 11, 2021, regarding the VERIZON IP ADDRESSES.  According to Verizon Wireless, the subscriber for all of the VERIZON IP ADDRESSES was LOCHER at the LOCHER RESIDENCE.  LOCHER's telephone number was listed as (310) 879-9271.  The listed digital device for this service is "Google PIXEL 4 XL Just Black 64GB" and IMEI of "356728100716543."

5.   Search Warrant for "Shark#5645" Corroborates Communications between LOCHER and Victim 1

28.  On or about June 23, 2021, Agent Sanford obtained a federal search warrant for a Discord username "Shark#5645," signed by the Honorable Charmaine G. Claxton, United States Magistrate Judge, Western District of Tennessee, Case. No. 21-SW-230.  The warrant authorized the search of the Discord account associated with "Shark#5645."  On or about July 27, 2021, Discord provided documents in response to the search warrant.  Agent Sanford reviewed the documents provided by Discord for "Shark#5645."  Agent Sanford reviewed chat communications between "Shark#5645" and Victim 1 for the period between January 21, 2021, and January 24, 2021, that were

---

[7] I observed additional IP addresses that according to Maxmind.com belong to Verizon Wireless.  They constitute a very small percentage of IP addresses that were logged.  The subscriber information for these IP addresses were not obtained. Based on my training and experience, this activity is consistent with a user who primarily logged onto an application at home, but also occasionally from other locations (thereby using different IP addresses).

identical to chat messages that Agent Sanford previously observed during her review of Victim 1's Discord account.

**B.   LOCHER Persuades Victim 2 to Engage in Masochistic Behavior and Send Nude Photographs via Skype then Nearly Succeeds in Bringing Victim 2 Back with Him to California**

1.   Victim 2's Parents Contact NCMEC about Victim 2's Masochistic and Sexualized Messaging to a Skype User Who Called Himself "Matt," and Law Enforcement Investigates

29.   On or about September 13, 2020, a parent of Victim 2 contacted NCMEC and reported the following communication with a Skype user later determined to be LOCHER:

a.   Victim 2, a 17-year-old female, has been talking with a man online for about two years using Skype.  He uses the Skype account of "daddyshark5."  He stated that his girlfriend uses the Skype account "cid.be3c15b9fc5df38f."

b.   Victim 2 called this man "daddy" and was constantly apologizing to him for growing up and not looking like a little girl.

c.   Victim 2 cut herself because "daddyshark5" asked her to.

d.   Victim 2 sent "daddy" sexual images and videos.

e.   "Daddy" wanted Victim 2 to run away once she turned 18 so that she and "daddy" can be together.

f.   "Daddy" goes by the name "Matt" or "Matthew" online.

30.   NCMEC sent their report, CyberTipline Report 79581967, to New York City Police Department ("NYPD") Internet Crimes Against Children ("ICAC") and Los Angeles Police Department

("LAPD") ICAC.  LAPD Detective Eric Good, upon being assigned
this case, contacted me and requested the assistance of the FBI.

31.  On or about September 21, 2020, the parent of Victim 2
provided her daughter's Samsung Galaxy J7 cell phone and gave
written consent to search the phone to NYPD.  On or about
October 28, 2020, NYPD created a forensic image of the phone.

32.  On or about June 1, 2021, LAPD Det. Good and I
reviewed the forensic image of the phone created by NYPD.  We
bookmarked approximately 38 photos of what appear to be cuts or
red marks, and close up images of female genitalia of Victim 2.

      2.   <u>LOCHER Travels to New York and Tries to Bring
Victim 2 Back with Him to Los Angeles, California</u>

33.  On or about July 12, 2021, I read a police report
prepared by the New York Port Authority Police Department ("Port
Authority PD") regarding an incident that occurred on or about
July 6, 2021, at the John F. Kennedy International Airport in
New York.  According to the report, Port Authority PD was on a
lookout for Victim 2, who was reported as a missing person by
her parent.  The parent had reported that Victim 2 was leaving
for California that evening with a 31-year-old male.  Port
Authority PD learned from Delta Airlines that LOCHER had booked
a reservation through Expedia for Victim 2 and the two were
traveling together to Los Angeles on Delta flight DL2186.
Victim 2 was removed from the gate area to the Arrivals area
where her parent and uncle responded.  Port Authority PD
confirmed the identity of Victim 2's traveling companion as

LOCHER.  LOCHER was allowed to travel to Los Angeles.  At the
time of this incident, VICTIM 2 was 18 years old.

### 3.   Identification of "LOCHER" as Skype User "cid.be3c15b9fc5df38f"

34.   On or about July 6, 2021, I reviewed a document
prepared by Special Agent Keyotta Sanford, FBI Memphis, of her
review of documents provided by Microsoft Corporation on or
about June 24, 2021, regarding subscriber information for Skype
accounts "cid.be3c15b9fc5df38f" and "daddyshark_5."  According
to Microsoft Corporation, "cid.be3c15b9fc5df38f" used the IP
Address 47.144.153.23 ("IP ADDRESS 2") to access Skype on or
about September 21, 2020.  According to Frontier Communications,
LOCHER was the subscriber of IP ADDRESS 2 and the LOCHER
RESIDENCE was the address associated with IP ADDRESS 2.  IP
ADDRESS 2 was assigned to LOCHER from on or about August 26,
2020, to December 11, 2020.

35.   Furthermore, the June 9, 2021 document provided by
Discord regarding Discord username "Shark" and user
identification "685830350735147059" showed that IP ADDRESS 2 was
used by "Shark" to log on approximately 12 times on or about
December 11, 2020.

### 4.   "Matt" Contacts Victim 2's Mother and Asks After Victim 2 in July 2021

36.   On or about July 22, 2021, Victim 2's mother
contacted New York FBI Special Agent Matt Deragon and informed
him that LOCHER sent a text message to her and asked about the
welfare of her daughter.  LOCHER asked if Victim 2 was "still

alive and okay?"  The mother stated that LOCHER contacted her using a telephone number 646-308-9704.

37.  On or about July 28, 2021, Det Good and I spoke with Victim 2's mother.  When asked how she knew it was LOCHER that texted her on or about July 22, 2021, she stated that she asked the person of his identity.  The person replied his name was "Matt."

38.  Victim 2's mother also advised that since being taken off the flight to Los Angeles, Victim 2 has not had access to a digital device to contact LOCHER.  Victim 2's mother opined it made sense that LOCHER attempted to find out about Victim 2's welfare through her.

**C.   LOCHER Persuades Victim 3 to Try to Kill Her Parents and Come to California So LOCHER Could "Use [Victim 3's] Body Whenever I Want in Whatever Way I Want."**

    1.   <u>Victim 3's Parents Report Disturbing Conversations Between Their Daughter and Discord User "HeyThere#2967"</u>

39.  On or about July 15, 2021, I reviewed HSI Cincinnati reports and documents pertaining to their investigation of a 12-old-year victim ("Victim 3") communicating with a Discord user "HeyThere#2967" ("HeyThere").  "HeyThere" was later identified as LOCHER.

40.  On or about July 10, 2020, the Springfield (Ohio) Police Department ("SPD") received a complaint from a parent ("Parent 3") of Victim 3 regarding a conversation the parent found on Victim 3's Discord account.  An individual utilizing the Discord username, "HeyThere," had been communicating with

Victim 3 regarding the possible murder of Victim 3's parents and running away to "HeyThere" in California.

41.   Parent 3 provided SPD with screenshots of conversations between LOCHER and Victim 3 which occurred on or about July 6, 2020.  The following are excerpts from the screenshots provided by Parent 3:

        a.   The following conversation involves Victim 3 discussing killing her family, and living with "HeyThere" so "HeyThere" could use Victim 3's body.  The conversation occurred on or about July 6, 2020:

**HeyThere:** Ohio, right?

**Victim 3:** Yes.

**Victim 3:** As a slave, what's the circumstances?

**HeyThere:** You're about a 3 day drive from here. Which I'm okay with taking that trip.

**HeyThere:** First, let me see you.

**Victim 3:** I plan on running tonight,

**Victim 3:** We can meet midway.

**Victim 3:** Or however far you'd get.

**HeyThere:** Will you have your phone on you?

**Victim 3:** I plan on stealing a parents.

**Victim 3:** Since, I'm murdering them all.

**HeyThere:** Oh okay

**HeyThere:** Now I know you're a troll lol.

**Victim 3:** I'm not sir.

**Victim 3:** I'm dead serious.

**HeyThere:** Alright, prove it. Let me see you and the murder

weapon. Which I don't mind if you do that.

**Victim 3:** I'll send you pictures of them dead after they are…

**HeyThere:** Okay, sure.

**HeyThere:** As soon as you send pictures I'll get in the car and leave.

**Victim 3:** Alright.

**HeyThere:** Good girl

**Victim 3:** But, I'd like to know the circumstances?

**HeyThere:** Well, you'd be kinda like a pet dog. Loved and cared for, but wouldn't have the same rights as a human. Also I'd use your body whenever I want in whatever way I want.

**Victim 3:** That's fine I guess.

**Victim 3:** Would I be able to at least do online schooling?

**Victim 3:** With a fake name and such.

**HeyThere:** I could set that up for you as a reward for being a good pet.

**Victim 3:** Alright.

**HeyThere:** Good good Also I'm also a teacher, so that'll work well for you.  How are going to kill them?...

> b.   On or about July 6, 2020, the following conversation occurred between Victim 3 and "HeyThere" discussing would meet:

**HeyThere:** Good that they'll be dead soon!...

**Victim 3:** How fast could you get to me on the highway?

**HeyThere:** It's 34 hours non-stop

**Victim 3:** Would you be willing to do that?

**Victim 3:** Ohio is infested with police everywhere, so I'd try
and make it to Kentucky by noon.

**HeyThere:** It'd probably take me a bit longer, but yes. If you
proved you're real, I'd already be leaving….

**Victim 3:** Alright.

**Victim 3:** Where in Kentucky should we meet?

**HeyThere:** Not sure yet, I'll have to see once I get going.

**HeyThere:** I imagine close to Ohio though

**Victim 3:** Alright….

**Victim 3:** Rest Area I-71/I-75 Northbound Florence KY?...

**HeyThere:** That looks good…

**Victim 3:** Whay [sic] part of CA?

**HeyThere:** Doesn't really matter silly….

**Victim 3:** Any suggestions to running away?

**Victim 3:** Since I plan on looking male and such, just incase
[sic] I encounter someone else.

**HeyThere:** Keep your weapon in your pocket hidden, but always
ready. And try to look confident and happy and clean.
If you look distressed people might try to stop you….


**HeyThere:** Can you take the phone into the bathroom? If you send
me a selfie I'll get going….

**Victim 3:** *Victim 3 sent a selfie photograph*

**HeyThere:** Oh you're super fucking cute

**Victim 3:** Thank you.

**Victim 3:** I'm used to being called ugly, haha.

**HeyThere:** You'll make a wonderful pet. You cutie….

**Victim 3:** What's your phone number?

**Victim 3:** And name?

**HeyThere:** Matt, and I'm not giving you my phone number right now, and we can use Discord to video call. In case the phone is found or anything like that, the less evidence the better….

**Victim 3:** How old do I look?

**Victim 3:** I'm 5 feet tall.

**HeyThere:** There, pretty young. Not sure how old you'll look with your hair cut.

      c.   On or about July 6, 2020, the following conversation involves Victim 3 and LOCHER discussing methods to make Victim 3 look older:

**HeyThere:** I'll just not let you outside for a few years and no one will care or notice. *[referring to people noticing Victim 3's young age]….*

**Victim 3:** Would I be allowed to stay in touch with my friend []?...

**HeyThere:** Sorry, but no. I'm really paranoid about that kind of thing. The police could find out about our location through her.

**Victim 3:** True.

**Victim 3:** What about once in awhile? Since I plan on destroying this phone after we meet up.

**HeyThere:** I'll tell you what

**HeyThere:** Keep her phone number, and every now and then I'll let

you call her if you've been good.

**HeyThere:** And once you're 18 you can talk to her more often….

**HeyThere:** I'm excited to get you

**Victim 3:** I'm excited to be with you sir.

**Victim 3:** This is like a dream I'll finally achieve after
waiting so long.

**HeyThere:** I'm glad cutie

**HeyThere:** What's your name by the way? lol

**Victim 3:** *[Name of Victim 3]*

**HeyThere:** Cute. But I'll probably rename you….

**HeyThere:** You will be trained to worship me above all. So it
would have to not interfere with that….

**HeyThere:** I want to see more of you if possible. I cannot wait
to get you in the car….

**Victim 3:** You're serious about everything. Correct? Since I dont
want to show up to some rest stop alone…

**HeyThere:** There is 1 freeway that I need to go through to get to
you, as far as I can tell it's the only one I can use.
It just got shut down due to the fires…

**HeyThere:** [*sends a news link from NBC Los Angeles regarding a
brush fire in Santa Clarita*]…

**HeyThere:** It would be best if you didn't kill them or anything
tonight and let me get most of the way there first….

**Victim 3:** Beginning in 15 minutes.

        d.   Parent 3 confirmed with law enforcement that on
July 6, 2020, Victim 3 set a fire at the bottom of the stairs

inside their residence the night the above-referenced conversation took place.

    2.   Identification of LOCHER as "HeyThere"

42.  On or about July 15, 2021, I reviewed a document provided by Discord on or about October 20, 2020, regarding Discord user name "HeyThere#2967" ("HeyThere") and user identification "685830350735147059."  Discord provided the user's login information between on or about March 7, 2020, and July 27, 2020.  I reviewed the login IP addresses and noted a majority of the IP addresses logged during the times Victim 3 communicated with LOCHER was 47.144.173.107 ("IP ADDRESS 3").  Specifically, "HeyThere#2967" used IP ADDRESS 3 to log into Discord approximately 2,155 times out of 2,189 logged IP addresses between on or about March 7, 2020, and July 27, 2020.  According to Maxmind.com, this IP address belongs to Frontier Communications.

43.  On or about July 15, 2021, I reviewed a document prepared by Frontier Communications dated on or about October 27, 2020, regarding IP ADDRESS 3.  According to Frontier Communications, the subscriber for IP ADDRESS 3 was LOCHER at the LOCHER RESIDENCE.  IP ADDRESS 3 was assigned to LOCHER from on or about January 29, 2020, to August 26, 2020.  This period includes the dates that "HeyThere" communicated with Victim 3.

    3.   Search Warrant for "HeyThere#2967" Corroborates
        Communications between LOCHER and Victim 3

44.  On or about July 28, 2020, Ohio HSI Special Agent Kimberly Wallace obtained a federal search warrant for Discord

username "HeyThere#2967" and the account for Victim 3, signed by
the Honorable Sharon L. Ovington, United States Magistrate Judge
in the Southern District of Ohio, in Case. No. 20-MJ-355.  On or
about October 20, 2020, Discord provided documents in response
to the search warrant.  I reviewed the documents provided by
Discord for "HeyThere#2967."  I reviewed chat communications
between "HeyThere#2967" and Victim 3 for the period between July
6, 2021, to July 21, 2021.  The chat communications provided by
Discord from July 6, 2021, are identical to Victim 3's Discord
chats with "HeyThere#2967" from that same date, screen shots of
which were provided by Parent 3 to law enforcement.

     **D.**   **THE LOCHER RESIDENCE**

     45.  On or about July 8, 2021, I reviewed a California
Department of Motor Vehicle ("DMV") information dated on July 8,
2021, for LOCHER.  According to the DMV, LOCHER listed the
LOCHER RESIDENCE as his most recent address.  A search was
conducted for a registered vehicle for LOCHER.  I was unable to
find a registered vehicle for LOCHER.

     46.  On or about July 22, 2021, I reviewed DMV information
dated July 16, 2021, on potential other occupants at the LOCHER
RESIDENCE.  I learned that Ruth Adaya Sanchez listed the LOCHER
RESIDENCE as her mailing address with the DMV on or about
January 28, 2021.

     47.  On or about July 28, 2021, I reviewed information
provided by the United States Postal Service ("USPS") on or
about July 27, 2021.  According to USPS, LOCHER last received a
parcel at the LOCHER RESIDENCE on or about July 23, 2021.

**E.   Execution of Search Warrant at the LOCHER RESIDENCE
And Confirmation of the SUBJECT ACCOUNTS**

48.   On July 29, 2021, in case number 21-MJ-03516, United
States Magistrate Judge Alicia G. Rosenberg authorized the
search of the LOCHER RESIDENCE (the "Premises Search Warrant").

49.   On July 30, 2021, the Premises Search Warrant was
executed at the LOCHER RESIDENCE.  LOCHER was present during the
execution of the search warrant.  Among the items seized from
LOCHER pursuant to the search warrant was his Google phone.

50.   During the execution of the Premises Search Warrant,
investigators previewed LOCHER's Google phone.  Investigators
found a Discord app on the phone.  On the app, they found
communication between LOCHER and a username that appears to
belong to Victim 2.  LOCHER was using the username of "TheHat."
I learned the following after watching the video of the review
of LOCHER's Discord account:

a.   On or about June 27, 2021, Victim 2 sent an image
to LOCHER of a female lying down with her shirt pulled over her
head.  She is naked from her waist to her shoulder.  Near her
breast appears to be cut marks.

b.   On or about July 5, 2021, Victim 2 sent an image
of her New York state identification card to LOCHER.

c.   On or about July 5, 2021, LOCHER sent to Victim 2
a list of "Things to bring" to California.  These items included
pacifier, fox doll, cash and headphones.

d.   On or about July 6, 2021, LOCHER sent a text to
Victim 2 and stated that he just landed.  On or about July 7,

2021, LOCHER sent a text to Victim 2 letting her know that he
wasn't being arrested.

      e.   On or about July 10, 2021, LOCHER sent a text to
Victim 2 that unless she was absolutely certain she could fly,
he would rent a car and drive to pick her up.

      f.   On or about July 25, 2021, LOCHER sent a text to
Victim 2.  He stated, "I know you have to still be at your
mother's.  Otherwise you'd have found a way to call me.  How do
you have less freedom with her than you did in the mental
hospital?!  What is she planning to do, keep you locked up for
the rest of your life?"

      g.   On or about July 26, 2021, LOCHER sent a text to
Victim 2, he stated "I love you more and I miss you terribly."

   51.  During the execution of the Premises Search Warrant,
LOCHER was interviewed by investigators.  LOCHER admitted to
using Discord usernames "Shark" and "TheHat".  He also advised
that he used a Twitch account to stream videos of himself
playing a virtual reality video game.  When asked about his
relationship with Victim 2, LOCHER requested for an attorney.

   52.  On July 30, 2021, LAPD Detective Good accessed
LOCHER's publicly accessible Twitch page.  LOCHER's Twitch
username was "Mattthehat."  LOCHER's Twitch page contained an
"about" button which had additional information about the user
account.  One of the links on the "about" page was to LOCHER's
Discord server.  Detective Good accessed the Discord application
using the link on the Twitch profile.  Detective Good then
joined the Discord server "MattTheHat."  Once he was on the

38

server, he was able to view all of the usernames of the people who had joined the server.  One of the usernames was "TheHat." He clicked on the username and was able to access the basic information about the user including the complete username of "TheHat#8031."  Below is an image of "TheHat#8031" taken by Det Good:



53.  On or about July 30, 2021, 90-day preservation letters were submitted to the PROVIDER for the contents relating to the SUBJECT ACCOUNTS.

54.  As described above, in previous conversations with the identified minors, LOCHER enticed, encouraged, and instructed the victims to produce child pornography and child sexual abuse material ("CSAM") in the form of sexually explicit images and video recordings of themselves to send to LOCHER over the internet, including through the use of Discord.  Given his history of using Discord and other applications to conduct sexually explicit communication with minors, LOCHER's current use of Discord to communicate with Victim 2 indicates to me that there is probable cause to believe that he is using the SUBJECT ACCOUNTS to unlawfully conduct sexually explicit communications with additional minors.

## VII.  <u>BACKGROUND ON E-MAIL AND SOCIAL MEDIA ACCOUNTS AND THE PROVIDER</u>

55.  In my training and experience, I have learned that providers of e-mail and/or social media services offer a variety of online services to the public.  Providers, like the PROVIDER, allow subscribers to obtain accounts like the SUBJECT ACCOUNTS. Subscribers obtain an account by registering with the provider. During the registration process, providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail or social media account.  Such information can include the subscriber's full name, physical

address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  Some providers also maintain a record of changes that are made to the information provided in subscriber records, such as to any other e-mail addresses or phone numbers supplied in subscriber records.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of an account.

56.  Therefore, the computers of the PROVIDER are likely to contain stored electronic communications and information concerning subscribers and their use of the PROVIDER's services, such as account access information, e-mail or message transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNTS.

57.  A subscriber of the PROVIDER can also store with the PROVIDER files in addition to e-mails or other messages, such as address books, contact or buddy lists, calendar data, pictures or videos (other than ones attached to e-mails), notes, and other files, on servers maintained and/or owned by the PROVIDER.

41

In my training and experience, evidence of who was using an account may be found in such information.

58.   In my training and experience, e-mail and social media providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, e-mail and social media providers often have records of the Internet Protocol ("IP") address used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNTS.

59.   In my training and experience, e-mail and social media account users will sometimes communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers of e-mails and social media services typically

retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNTS.

60.  I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time.  Accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider.  They may also be used by multiple people.  Given the ease with which accounts may be created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an account, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular account.  Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was.  Often those pieces will come from a time period before the account was used in the criminal activity.  Limiting the scope of the search would, in some instances, prevent the government from identifying the true user

of the account and, in other instances, may not provide a
defendant with sufficient information to identify other users of
the account.  Therefore, the contents of a given account,
including the e-mail addresses or account identifiers and
messages sent to that account, often provide important evidence
regarding the actual user's dominion and control of that
account.  For the purpose of searching for content demonstrating
the actual user(s) of a SUBJECT ACCOUNTS, I am requesting a
warrant requiring the PROVIDER to turn over all information
associated with a SUBJECT ACCOUNTS with the date restriction
included in Attachment B for review by the search team.

61.  Relatedly, the government must be allowed to determine
whether other individuals had access to a SUBJECT ACCOUNTS.  If
the government were constrained to review only a small
subsection of an account, that small subsection might give the
misleading impression that only a single user had access to the
account.

62.  I also know based on my training and experience that
criminals discussing their criminal activity may use slang,
short forms (abbreviated words or phrases such as "lol" to
express "laugh out loud"), or codewords (which require entire
strings or series of conversations to determine their true
meaning) when discussing their crimes.  They can also discuss
aspects of the crime without specifically mentioning the crime

involved.  In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters.  "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachment B, is necessary to find all relevant evidence within the account.

63.  This application seeks a warrant to search all responsive records and information under the control of the PROVIDER, which is subject to the jurisdiction of this court, regardless of where the PROVIDER has chosen to store such information.

64.  As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER, under seal, until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

a.   I make that request because I believe it might be impossible for a provider to authenticate information taken from the SUBJECT ACCOUNTS as its business record without the original production to examine.  Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case.  If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from the SUBJECT ACCOUNTS.

b.   I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers.  For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted.  As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account.  Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

## VIII.        REQUEST FOR SEALING

65.   It is respectfully requested that this Court issue an order sealing, until further order of this Court, all papers submitted in support of these applications, including the applications, affidavit, search warrants, and the requisite inventory notice (with exception of one copy of the warrant and the inventory notice that will provided to the PROVIDER). Sealing is necessary because the information agents intend to seize are relevant to an ongoing investigation.  Based on my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on this continuing investigation and other child pornography investigations involving the Discord application and may jeopardize its effectiveness by alerting potential targets to the existence and nature of the investigation, thereby giving them an opportunity to flee, or to destroy or tamper with evidence.

## IX. <u>CONCLUSION</u>

66.   Based on the foregoing, I request that the Court issue the requested warrant.   The government will execute this warrant by serving the warrant on the PROVIDER.   Because the warrant will be served on the PROVIDER, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 20th day of
August, 2021.

_____
Honorable Pedro V. Castillo
UNITED STATES MAGISTRATE JUDGE